## DE VOS *v.* GRAY.

VENDOR AND PURCHASER—RESCISSION—CANCELLATION.

In a suit by the purchaser for the cancellation of certain contracts, one for the purchase of a lot, and another providing that the vendor loan the purchaser certain moneys to build a home on the lot, and to recover the money paid under said contracts, evidence reviewed, on appeal, and *held*, to support a decree in favor of plaintiff.[1]

Appeal from Wayne; Mandell (Henry A.), J. Submitted October 22, 1924. (Docket No. 68.) Decided April 3, 1925.

Bill by Kenneth M. deVos against Edward Gray for the rescission and cancellation of certain contracts. From a decree for plaintiff, defendant appeals. Affirmed.

*Elmer R. Milburn*, for plaintiff.

*Lucking, Helfman, Lucking & Hanlon*, for defendant.

MOORE, J. This suit is brought to obtain a res-

[1] Cancellation of Instruments, 9 C. J. § 195; Vendor and Purchaser, 39 Cyc. p. 2067.

cission and cancellation of two contracts entered into between the parties, the first being a land contract dated June 11, 1922, under which the plaintiff purchased from the defendant lot No. 13 in a subdivision known as Grayhaven, and the second being a contract dated September 1, 1922, wherein the defendant agreed to loan the plaintiff 90 per cent. of the cost of a house to be built upon the above-mentioned lot, and to recover from the defendant all sums paid by the plaintiff on account of said land and loan contracts and all sums expended by the plaintiff or for which he had become liable in the construction of said house. From a decree in favor of the plaintiff the case is brought into this court by appeal.

About the year 1915 the defendant became the owner of 60 acres of land largely submerged bordering on the Detroit river. He caused a U shaped lagoon to be dredged therein and caused the land outside of the lagoon to be filled with earth obtained largely from excavations made in the construction of buildings in Detroit. It was the hope of Mr. Gray to make a fine residential district. In his testimony he said:

"And in selling these lots, I told all purchasers that each of the building lots would be, or were restricted to the uses described here. I have kept what I believe is a very comprehensive drawing, posted on the premises. In fact, there are several of them on the premises now, showing in detail. Of course, we have always tried to make it perfectly clear to every one just what we were trying to do. We were trying to make the nicest city owned site in the world for a man to live, on a small lot.

"*Q.* You would not have anything objectionable there at all? It was a high price residential section?

"*A.* That's it. It was to be as good as any residential section in the city, when it was completed. It was to have every convenience that they have any place else in the city, with the added feature of a water front, and the ability to put a boat well under

one's own house.    I have told everybody that—whose ears I could get."

His plans had so far progressed that he prepared advertising matter which showed how he expected Grayhaven would look when his plans were completed.

At the head of the lagoon there were shown on one of the advertisements pictures of three beautiful ten-story apartment houses.    Below the picture and in the printed part it was said among other things:

"Just across Riverside drive and separated from the residential section will be three apartment buildings. In the middle one a central power plant will be located which will furnish the homes with heat, light and power, thereby eliminating the handling of coal, ashes, ice, etc.    All wires and heat mains are underground in a tunnel beneath the sidewalks.

"The streets and waterways are private, making them safe, quiet and free from public use and annoyance.    The land rises to a height of eight feet at the building line, hence the basements are wholly above river level.    The soil is hard blue clay, making the cost of foundations as low as in any other part of Detroit.    A two-foot concrete sea wall will be built along the entire water front, providing substantial docks.    *    *    *

"Grayhaven is twenty minutes from the city hall and combines in itself all the advantages of city, suburban and lake shore year round home, with canoeing, yachting, sailing, swimming, fishing, skating and ice-boating in your own front yard.    Nowhere in the whole world can you find a community developed as is Grayhaven for comfort and pleasure."

The plaintiff was attracted to the property and bought on land contract lot 3.    Later this lot was exchanged for lot 13.    The last named contract was dated June 11, 1922, though it was not executed until some time in August.    Because of lot 3 being turned in, a credit of $2,540 was given on the land contract for lot 13, and the balance was to be paid in monthly

installments of $85, and the interest on the principal sum.

There were in the land contract many restrictions and provisions not necessary to mention, but the following are important:

"Improvements:

"Vendor agrees to construct or install the following improvements:

"1. Cement sidewalks not less than five feet in width on the street side of all lots, within 1 year from the date hereof.

"2. Asphalt pavements on Starboard drive, Port drive and Keelson drive, as laid out in Grayhaven within 1 year from date hereof.

"3. Concrete retaining wall along lagoon edges as dwellings are constructed.

"4. Sanitary sewer, hot and cold water mains, heating mains and electric light as dwellings are constructed.

"5. To construct within 2 years from date hereon an artistic private entrance to driveways from Avondale avenue.

"6. Vendor agrees in selling platted lots in Grayhaven to conform to the plan set forth on the plat above referred to.  *  *  *

"Time shall be the essence of this contract, and if vendee shall fail to make any of the payments or perform any of the conditions above set forth in the manner and at the time above limited thereof, vendor shall immediately after such failure have the right to declare this contract terminated, and may thereupon retain whatever may have been paid hereon, and the premises, together with all buildings and improvements, as stipulated damages for the breach of this contract, and rent for the use of said premises.  *  *  *

"In addition to the foregoing remedy, but not in limitation thereof, vendor shall in case of default of vendee have the right to declare the entire balance due upon this contract and proceed to immediate collection thereof, either by suit at law or in equity.

"Deed and Abstract.

"Upon the execution of this contract, and so long as vendee shall not have defaulted thereunder, vendee

shall have possession of said premises and upon payment to vendor of the sums chargeable hereon and the performance of all agreements herein in the manner and at the time above limited, vendor, upon surrender of this contract, will execute and deliver to said vendee a good and sufficient warranty deed to said premises, warranting same against all liens and incumbrances, except such as may have accrued on said land or buildings thereon subsequent to the date hereof by or through the acts, omissions or negligence of vendee and except any and all restrictions hereinbefore or hereinafter imposed." * * *

As an inducement to the lot owners, defendant proposed to finance the erection of dwellings for lot owners to the extent of 90 per cent. of the cost, and negotiations were entered into between the parties hereto with that purpose in view.

It is claimed by the plaintiff that in August or early September, 1922, he was told by the defendant that he had completed his financial arrangements and that they were in substance that defendant had $500,000 on hand with which to begin work, and that he had arranged for a loan of $2,000,000, and that he could get the money faster than he could use it, and that he was going to begin the construction of the apartment houses and complete all the improvements in the subdivision at once, and that if plaintiff would go ahead with the construction of his house he would have the pavements and sidewalks in that fall, and that heat, light and water would be provided as soon as the plaintiff was ready for it, and that, relying on these representations, plaintiff entered into the so-called loan contract of September 1, 1922. The defendant gives a different version as to the representations he made at this time. He says in substance that on August 10, 1922, he obtained a loan of $550,000 from the Dime Savings Bank, and on August 28, 1922, closed an agreement with the Lincoln Housing Trust providing for a loan of $3,000,000 to be forth-

coming in installments as building progressed, and that he told the plaintiff nothing that was not true.

Some of the provisions of the loan contract were as follows:

"E. G. This contract is based on a residence costing thirty six thousand dollars ($36,000.00)."

"E. G. Borrower may furnish material and labor at price quoted by lowest bidder.

"This agreement made the 1st day of September, in the year 1922, by and between Edward Gray, hereinafter called the lender, and Kenneth M. deVos, hereinafter called the borrower, witnesseth: * * *

"It is agreed that the borrower will at the time of making a contract for the construction of said dwelling deposit ten (10) per cent. of the total cost thereof with the lender and that on the 10th day of each month there shall be paid to the lender or other contractor the total value (except, however, that said borrower may agree with such other contractor to pay a smaller per cent. of such total value) proportionate to the amount of the contract of labor and materials incorporated in the work up to the first day of that month as estimated by the architect, less the aggregate of previous payments. Ninety per cent. of such monthly payments shall be advanced by the lender upon architect's certificates and the remaining ten per cent. shall be paid out of the funds so deposited by the borrower. The borrower agrees to repay the advances so made by the lender at the rate of one per cent. of the total cost of the construction of said dwelling per month. * * *

"It is further agreed that said borrower shall not be entitled to a deed of said premises from said lender until all of the moneys so advanced, as well as the purchase price of the premises hereinbefore specified in said agreement of June 11, 1922, shall have been repaid to the lender.

"Time shall be of the essence of this contract and if the borrower shall fail to make any of the payments or perform any of the conditions or covenants above set forth in the manner and at the time above limited therefor, the lender shall immediately after such failure have the right to declare this contract terminated and may thereupon retain whatever may have

been paid hereon and the premises, together with all buildings and improvements as stipulated damages for the breach of this contract and rental for the use of said premises.   *   *   *

"In addition to the foregoing remedy, but not in limitation thereof, the lender shall in case of default of the borrower have the right to declare the entire balance due upon this contract and proceed to immediate collection thereof."

A contract was soon let for the building and the construction work begun.    It was not long before differences arose.    The contractor put in the foundation for the north wall of the building.    Mr. Gray claimed to him that he did not go deep enough and made some criticism of the plaintiff, which was reported to the plaintiff and gave rise to an unpleasant interview.    The specification required the foundation should be placed on a solid bearing, and it was claimed by the plaintiff and his contractors that the north wall was so placed, while the defendant claimed the trench should have gone entirely through the filled earth. All of the foundations and concrete walls up to the grade line were finished before November 1, 1922.

After the house was under way the defendant constructed a roadway across the rear end of plaintiff's lot.    This gave rise to trouble, which resulted in plaintiff commencing an injunction suit December 11, 1922, which counsel for the defendant say is still pending.

During the summer and fall of 1922 plaintiff had a pleasure boat constructed in Bay City which he desired to put into his boat well before the cold weather came, and trouble arose between the parties about the removal of the dike at the entrance of the boat well from the lagoon.    Complaint was made by the defendant about the way the boat well was constructed.

The defendant made his first advance under the loan contract on November 3, 1922, on which date he paid $1,000 to Hanna, Zabriskie & Daron.    He made a

second payment of $2,000 to the same firm on November 13, 1922, and on December 18, 1922, another payment amounting to $4,047.50 was made to them.

The plaintiff paid all the monthly installments on the land and loan contracts as they matured and made his last payment on January 8, 1923; this payment being received by the defendant on January 9, 1923. On January 12, 1923, the defendant caused written notices to be served on the plaintiff dated January 11, 1923, declaring due the entire balance unpaid on the land contract and all amounts advanced by the defendant on the loan contract, and demanded that the plaintiff pay the same forthwith, claiming in these notices that the plaintiff had defaulted in the performance of the contracts in that he had, in the construction of the dwelling house upon said premises, without the written consent of the defendant, departed from the plans of said dwelling as approved by the defendant, in these respects: (1) that the plaintiff had failed to carry the foundation supporting the north wall of the residence down to the depths called for on said plans, but had installed and constructed said foundation to a depth of one foot and two inches only below the water level adjoining said lands, and (2) that the plaintiff had substituted a tile and concrete slab for a flat concrete slab on the first floor of said residence.

At the time these notices were served, the building was ready for the roof. The defendant had not, previous to the service of these notices, made any claim or notified the plaintiff that he considered the installation of the tile and concrete slab as a departure from the plans. The plans of the building that were filed with the building department and approved by the building department and on which the building permit was issued, provided that a tile and concrete slab should be put in on the first floor,—a copy of these plans were on file in the defendant's office; the de-

fendant was at the building and saw this slab being installed and when the notices were served on January 12, 1923, the slab could not be removed and replaced without tearing down the building.

These notices were followed by more formal ones under date of March 5, 1923, in which Mr. Gray declared as to the land contract he had

"elected and he does hereby so elect to declare, and he does hereby declare himself released and discharged from any and all liability respecting any of the covenants contained in said contract and undertaking on his part to be performed. And the undersigned does hereby elect to declare said contract void, and his further obligation thereunder released and terminated, said declaration to become effective immediately."

As to the loan contract Mr. Gray said:

"Therefore, the undersigned has elected and he does so hereby elect to declare, and he does hereby declare himself released and discharged from any and all liability respecting any of the covenants contained in said September contract, and the undersigned does hereby elect to declare said contract void and his further obligation thereunder released and terminated, said election and declaration to become effective forthwith.

"And you will please also take notice that you are hereby required forthwith to quit, surrender and deliver up possession to the undersigned of the dwelling mentioned in said September contract, for the reason that the undersigned intends forthwith to repossess himself of the said dwelling.

"EDWARD GRAY."

On the 14th of March, 1923, the bill of complaint was filed in the instant case asking for a rescission of the contracts, and for a return of the money invested by the plaintiff in the enterprise.

The bill of complaint is very long and sets out in detail the plaintiff's version of the transactions between the parties and claims that because of the fraud practiced by the defendant in the representations made

as to his finances, and his ability to go on with his building operations, and his failure to do as he agreed, plaintiff was entitled to rescind the contracts. Defendant answered at length and claimed the plaintiff was the first one to breach the contract, and that defendant was entitled to affirmative relief, and to retain all moneys paid by the plaintiff.

We have already mentioned the result in the lower court.

Counsel for the appellant discuss the case under the following heads:

(1) Defendant is not guilty of the false representations of existing fact alleged by plaintiff.

(2) Defendant is not guilty of fraudulent promissory statements as to the future development of Grayhaven sufficient to justify rescission by plaintiff for deceit.

(3) Plaintiff within the time limit allowed for performance of a contract, is not entitled to have a rescission for possible anticipatory breach of such contract, nor can plaintiff in this case have a rescission, while he is himself in default under the contract.

(4) In any event, plaintiff has waived his right of rescission.

and it is urged under this head that plaintiff knew the exact facts when he entered into the contracts.

(5) Plaintiff is guilty of material departures from agreed plans, in construction of the Grayhaven house warranting the exercise of defendant's election to terminate contract relations with plaintiff and enforce immediate payment of all sums owed by plaintiff.

(6) Defendant has not waived his contractual remedies and elections with respect to plaintiff's defaults.

Counsel argue at great length under each of these headings, and conclude their brief as follows:

"We ask, therefore, that the decree of this court sustain the defendant's termination of the contract. Strictly speaking and in full accordance with the terms of the contract, the plaintiff is entitled to no compen-

sation or restitution for any investment he has made in the property because his contracts have been terminated for good and sufficient cause. However we appreciate the fact that this is a court of equity, and that courts of equity desire to relieve from forfeitures. We therefore urge if this court desires to relieve from forfeiture that the decree provide for such relief from forfeiture, provided plaintiff pay the defendant, within a time to be stipulated in the decree, the sums unpaid on the land contract for the purchase of the lot with interest thereon, and an amount equal to sums advanced by the defendant to the plaintiff for the construction of the house and unpaid, with interest thereon, upon which payments the defendant shall deed the plaintiff the property in question, and all contract relations between the parties aside from those contained in a mere warranty deed of the premises to the defendant shall be terminated. The warranty deed should contain, of course, the uniform restrictions contained in the land contract. The decree should provide also in event the sums be not paid within the time specified, that all interest of the plaintiff in and to the land and buildings in question be terminated."

The record is a long one containing more than 600 pages. The case is very thoroughly and exhaustively briefed and we shall not attempt to follow in this opinion the argument of counsel nor shall we quote at length from the record, but some excerpts from the testimony of Mr. Gray will be helpful:

"*Q.* So that in August of 1922, you didn't have any present intention at that time of starting some of the apartment houses on Grayhaven?

"*A.* I, had.    May I consult my notes?  *  *  * We made that contract, which provided for the money on May 1st.    Now, in August we did announce that we expected to go ahead on the apartment houses on May 1st.    I have got that date, because that was the date that we signed the contract.

"*Q.* So that in 1922, you did contemplate the erection of some apartments?

"*A.* Yes.  *  *  *

"(Witness continuing):    As to any announcement

in August, 1922, to Mr. deVos that I made all arrangements for the financing of our apartment houses, and that I was all ready to go ahead, and that I would start immediately to erect the apartment houses, if I told him anything, I told him facts. I had made the arrangements with the Lincoln Housing Trust to get the money in May. I think I told that to Mr. deVos. I told him where I was getting the money, if I told him at all. I don't recall showing him a copy of the contract with the Lincoln Housing Company. It was the Lincoln Housing Trust that I made my arrangements with for the money for the apartment houses. I had no arrangement elsewhere for the apartment houses. I have since had a suit with the Lincoln Housing Trust in which I seek to cancel my arrangement with them. We seek to recover a mortgage. They have announced that they cannot carry out their end of the contract. We are trying to recover our mortgage.    *    *    *

"We can't go ahead with the apartment buildings. I haven't any funds to build them with. I did not have any funds with which I could build them with— or could arrange for, in 1922, other than the Lincoln Housing Trust. I depended entirely upon the Lincoln Housing Trust to build those apartment houses. We can go ahead with the central heat and power plant on a temporary plan. As a matter of fact, we don't anticipate building a permanent plant this year. As to whether I told Mr. deVos that when he signed that contract, I didn't know that it concerned him. We obligated ourselves to furnish the heat, and he doesn't care whether it comes from a permanent or temporary plant. I obligated myself to furnish hot water, and heat, and sewers, and we will do it, too.

"Q. But you haven't done anything yet, towards it?

"A. He is not ready for it.

"Q. You didn't think that Mr. deVos was in any way concerned about your improving your property there with the apartment houses?

"A. Well, I didn't understand that it was a part of the contract. We certainly could not agree to build a couple of million dollars worth of apartments to satisfy a man that buys a $7,500-lot. It is a part of our scheme. It will go through.

"Q. When?

"*A.* Oh, I would say it won't be within five years.

"*Q.* It would be five years before you will have any apartment houses in that property, you mean?

"*A.* I said that the finishing up won't be in five years.

"*Q.* When will you have the first apartment house on that property?

"*A.* I don't know.

"*Q.* When will you have the central heating and power plant on that property?

"*A.* We will have the heating and power for any man that needs it when he needs it.

"*Q.* When will you have your permanent central heating power plant on that property?

"*A.* I don't know.

"*Q.* When will you have your sewer in?

"*A.* We will have the sewer in when the house needs it.

"*Q.* When will you have the water in?

"*A.* We have had water into the deVos house, we can have.

"*Q.* When will you have the permanent water main?

"*A.* Well, the permanent water main does not concern him at all. I can give him water in twenty-four hours. I can give him water in five hours.

"*Q.* By laying a pipe on top of the ground?

"*A.* Yes.

"*Q.* But he cannot use it in the winter.

"*A.* We will have it in by winter, if that will satisfy you.

"*Q.* When does this house need sewer and water?

"*A.* When it is completed.

"*Q.* Under your land contract you agreed to furnish sanitary sewer, hot and cold water mains, heating mains, and electric light, as dwellings are constructed.

"*A.* Yes.

"*Q.* That doesn't say when they are completed.

"*A.* The dwelling is not constructed until it is completed."

It may be well to digress here and speak of the situation as it actually was in August and September, 1922. Mr. Gray had negotiated a loan of $550,000 with the Dime Savings Bank. He had $126,000 in

the bank a short time later. The record does not show what became of the rest of the $550,000, but it is clear that Mr. Gray did not have it on hand when the loan contract was made. The arrangement with the Lincoln Housing Trust proved a delusive hope. It did not bring him any money, but brought him a law suit which found its culmination in this court in the case of *Gray* v. *Lincoln Housing Trust,* 229 Mich. 441. A reading of the opinion in that case will throw some light upon this case.

It may be well to quote some of his testimony as to the north wall:

"There is now a crack starting at the top corner of the garage door. Showing settlement. I would say that there is probably, well, a two-inch settlement, to make this crack open up the amount it has opened up. They have underpinned the wall, partially. They have underpinned a short section of it. But it will undoubtedly increase because the building is not loaded as yet; it is not finished. The load is constantly increasing in the building, until it is finished and furnished.

"They ought to underpin the whole wall. That is done by excavating small sections under the wall, and filling it with concrete. You would take at a time a section of a couple of feet. It is not such a very expensive job. Of course it is a tedious job. By doing two feet of the wall at a time, that does not rob the wall of excess of bearing, to make it liable to settle down while you are underpinning it."

He said he thought the crack was 1/16th of an inch wide.

There was testimony of competent witnesses who examined the crack a short time before testifying, who testified it was a season check not more than six inches long and 1/64th of an inch wide, and that the wall had not settled. In this connection it should not be forgotten that the building was erected for Mr. deVos. It, with any defect in it, would be his when completed. The record shows he was a builder

of large experience, familiar with foundations and their construction, and it is not likely that he would knowingly consent to a foundation wall that would make him serious trouble.

There are two or three outstanding facts in this case which are undisputed. The first is that the Grayhaven, so much advertised, and that was to be begun at once when plaintiff entered into the loan contract, is a very different Grayhaven from the one that in fact materialized. The second fact is that no one knows when the ideal Grayhaven will materialize. This may not be any fault of Mr. Gray, unless it be a fault to be over optimistic. The third important fact is that the promised sidewalks, pavements, water mains and other promised conveniences had not been constructed even as late as when the case was tried. Another important fact is that though Mr. deVos has invested more than $20,000 in the lot and house, having met his payments on both contracts up to the last moment, he is unable to complete his house because the defendant declares he is absolved from any liability under either contract, and declines to make any further advances of money.

Without going into further detail we shall close this opinion by saying that the decree is an equitable one, and is affirmed, with costs to the appellee.

MCDONALD, C. J., and CLARK, BIRD, SHARPE, STEERE, FELLOWS, and WIEST, JJ., concurred.